## Robert McKnight, Appellant, *v.* Edward Bell.

*Ejectment—Parol partition—Evidence.*

In an action of ejectment where the plaintiff sets up a record title, and the defendant offers evidence tending to show that plaintiff and his brother, who was defendant's predecessor in title, divided the land which they held as tenants in common by a parol partition; and that in pursuance of this partition, plaintiff's brother entered into possession of the land in controversy, which testimony is contradicted on the part of plaintiff, the case is for the jury.

Argued April 25, 1895. Appeal, No. 143, Jan. T., 1895, by plaintiff, from judgment of C. P. Blair Co., June T., 1887, No. 71, on verdict for defendant. Before STERRETT, C. J., GREEN, MITCHELL and FELL, JJ. Affirmed.

Ejectment for a tract of thirty-nine acres and sixty perches of land in Antis township. Before LANDIS, P. J.

At the trial it appeared that Robert McKnight, Sr., died in 1860, leaving a farm, the north end of which became vested in his two sons, Robert and William, as tenants in common. The land consisted of about eighty acres, and through its center ran a lane in a northwesterly direction, dividing the land about equally. Robert, the plaintiff, claimed to recover an undivided one half interest in the land north of the lane. Defendant claimed that Robert and William had made a parol partition, and that William had taken possession of the northern part, and Robert the southern part of the land. Defendant claimed under a sheriff's deed of the northern part of the land, which had been sold as the property of William McKnight. Further facts appear by the charge of the court, which is in part as follows :

" The plaintiff, to make out his prima facie case, showed the facts we have already narrated, leading up to the title vesting in him and brother William, thus making them equal tenants in common of both ends of the eighty-acre piece, and consequently the owner of the undivided half of the north end, now in possession of Edward Bell, the defendant in this suit. This suit was brought by Robert McKnight to recover the possession of the undivided one half of this thirty-nine acres, or north end piece, and having shown title in himself, he would be entitled to recover here if there were nothing more in this case.

" Resting on this, we turn to the defendant to learn his reply, and we find that he claims to own that which is claimed by the plaintiff by reason of what took place after the title had vested in Robert and William.

" He says that true it was that the title properly vested in Robert and William, but that after that they made an amicable division or partition of the eighty-acre piece, that they agreed to do this by William taking and retaining for his own exclusive use the north end, and Robert taking and retaining for his own exclusive use the south end of the piece, agreeing that the lane should form the line of division, and that ever after each should hold these respective pieces of land in severalty, and no longer as tenants in common.

" To support this they call several witnesses. First they call Blair McKnight, who says that he and Robert and William were to take the farm, and then Robert and William would

take the western half and he the eastern half. It was also at the same time understood that when the division should be made that Robert and William should divide the western part by William taking all north of the lane, and Robert taking all south of it. He says that this was often talked over by all the heirs and thoroughly understood.

"John P. McKnight is called, who says substantially the same as Blair; that it was for some time understood by all the heirs that this method of division should be adopted, and was actually carried out. The partition of the eighty acres between William and Robert was not evidenced by any writing, but they agreed it should be so, and it was done so; that William took possession of his piece, and Robert of his piece, the lane dividing the two pieces. William built a house on his piece, and Robert built a barn on his piece, and later commenced the erection of a house on his piece, though he never completed it, and sold off the materials prepared for it. He says he rented from William one year and paid him the rent. Robert had nothing to do with it, and never spoke about it; always saw Robert work the south end, and never saw either doing anything on the land of the other. He says each used and worked each piece separately, and as two persons who owned separate lands.

"[Blair McKnight says that the partition was first amicably agreed on, as stated by John, and then William was to take in severalty the north half of the eighty acres, and Robert the south half, the lane being the line; that he rented for one year from William, and Robert had nothing to do with it, and was not consulted. He raised corn, potatoes and 'truck,' and saw Robert working the other side of the lane.] [1]

"[Scott Gwin says he was employed by Wilson to survey the farm for the heirs; divided it into pieces by the old township road, and then divided the eighty acres on the west side by the lane. When he ran the lines of these two thirty-nine-acre pieces Robert was there, and all the heirs were there during the work. He made no objection to the line of the lane, and made copies of his survey, and gave each of them a copy. It shows this subdivision by the lane, and is in evidence. His bill was $20.00—$5.00 to Robert and William each, and $10.00 to Wilson and Reuben, whose land he had also divided into two parts.] [2]   Only $15,00 were paid.

" W. J. Estep was the assessor, and in 1879 called and saw all the four sons; met Robert in the lane, and he gave him the thirty-nine acres south of the lane, and saw William, who gave him the thirty-nine acres north of the lane. Both Robert and William told him that they had divided the pieces by the lane, and each owned on each side. The assessment books in evidence it is claimed corroborate Mr. Estep, as they show just such assessments. They further show the same assessment down as late as 1884, after both pieces had changed ownership.

" [A. J. Irvin lived near the land, and says Robert told him the land was divided between him and William, but he (Robert) had in 1880 or 1881 offered to sell him his piece; that he rented the north end from William, and Robert had nothing to do with it; that Robert had commenced the erection of a house, but did not finish it, but a stable was built on it; and a new house on William's end; saw Estep one day talking to William in the field.] [3]

" [Thomas Thompson saw Robert fixing or preparing the foundation for a new house on his piece. He talked with him at the time, and Robert said he and William had parted the land between them, and he was now going to build a house on his end. Lumber, stone, etc., were there. He never saw any one but Robert work on the south end, and never saw him work on the north end.] [5]

" Louis Reigh was passing and saw Robert and talked with him. Robert said it was his land, and that he had built a barn and planted an orchard on it. He pointed to the north side and said William owned that side; this was about 1879. He has seen each working on his own side.

" John P. Bell says that he cut the lumber for Robert's house and cropped the land for him, and William had nothing whatever to do with it. At that time I think William was improving his own land.

" A. L. McCartney had a conversation in 1879 or 1880 with Robert; he went to collect a debt. Robert said he would sell him his end; McCartney said he would not want it unless he could get both pieces; then Robert said William would sell him his end. He never had any knowledge that Robert claimed any interest in the north end. Have heard him say that he and William had divided it. He afterwards bought at sheriff's sale the north end—William's end.

"Edward Bell, the defendant, says Robert told him he and William had divided the eighty acres, and that Robert had taken the south side and William the north side. He knows each farmed or controlled his own side. William asked him several times to buy his land, as he was embarrassed with debts. This was after Robert's piece had been sold by the sheriff, and after that William remained on his side. When McCartney bought the north end at sheriff's sale Robert made no claim, and William neither did nor said anything admitting Robert's right.

"The next spring Mr. Bell bought from Mr. McCartney and paid $900 for it—more than it was worth. In the following September he heard for the first time of Robert's claim to the undivided half of it, and you will remember what took place between them in regard to Robert's turning in his stock; in which a verdict against Robert was rendered in favor of Mr. Bell. The record of this is in evidence here now.

"Mr. Bell finally says he bought this property from McCartney because he understood from Robert that he and William had divided the land, and he observed that for six years thereafter each occupied and exhibited an ownership consistent with the statement of Robert that there had been an actual partition. This statement made by Robert, defendant claims by his counsel, estops plaintiff from afterwards creating a title to the north end, but as to this we refer further on.

"Defendant further points to the description of the lines in the sheriff's sale of both the north and south ends, to show that the metes and bounds are those of separate pieces, and as fixed by the surveyor, and each piece is called for as an adjoiner to the other.

"The defendant then puts in evidence a judgment against William, on which there are proceedings in execution, resulting in a sale by the sheriff, June 20, 1884, of the north end, or William's piece, as it is called, to A. L. McCartney, who, by his deed, also in evidence, dated June 15, 1885, conveyed to Edward Bell, the defendant in possession of the land in controversy.

"[This is the defendant's case, and it will be observed, if defendant's witnesses are believed, that there was an amicable division or partition of the eighty-acre piece between William

and Robert, and this being under the law equivalent to a release of title by Robert in the north end to William, would give William the absolute title to the thirty-nine acres and fifty perches comprising the north end, and when the sheriff levied on William's interest therein and sold it in 1884 to A. L. Mc-Cartney, he sold and conveyed to McCartney both the interests of William and Robert, or the whole title to the north end, and Robert would have no right to recover in this suit.] [5]

" But if there was no such partition, then Robert's interest to the extent of one half in the north end had never passed out of him, and the sheriff's sale to McCartney only passed William's interest in the north end, which would be one half, leaving the other half still in Robert, and in that event Robert would be entitled to recover that undivided half in this suit.

" In support of this contention, and in reply to defendant's witnesses, the plaintiff introduces rebutting testimony, and calls several witnesses.

" He calls first, Wilson McKnight, who says he was one of the sons, and they did all talk and agree upon an amicable partition, but it was that Blair, William and Robert should take the farm ; that Blair should take the ninety-six acres east of the old road, and William and Robert the eighty acres west of the old road ; that the necessary indentures and conveyances for effecting this object were duly executed, but he knows of none between William and Robert dividing the eighty acres ; that it was not agreed in this conversation that they would do so, that he never heard them say they would do so, and that they never did so. Furthermore they farmed it together ; he gave them the privilege of using the old barn for their hay and grain ; that they jointly and at joint expense put up the stable and the house ; that they shared the proceeds, the hay and other products sold in Altoona ; that William claimed to own an interest in the south end ; that Willam owed Robert a judgment note of $580, and to pay this off and lift it he, with the other heirs, conveyed his interest in the north end ; that Edward Bell told him he knew nothing about Robert claiming an interest in the north end then owned by him (Bell) ; that he, Bell, would give Robert $300 for his interest in it. He further said that Mr. Bell recognized that Robert had his interest in the north end.

"Mrs. Baitland says she lived at the homestead in 1879, and saw Estep, the assessor; he came in and asked for ink, as he had forgotten his. This is to contradict Estep when he says he assessed Robert and William each with thirty-nine acres given to him by each, and wrote it down outside in their presence. She also says Robert farmed on both sides of the lane, and cut hay on both sides.

"William McKnight repeats substantially Wilson's story as to the partition, and that he and Robert never did agree to divide the eighty acres, but they talked as though they might some day do so, but had not divided it, and could not, because the incumbrance on the whole eighty acres would have prevented it; that the improvements were done by them jointly, and located so that in case of a division they would be found suitable; they raised hay principally and sold it in Altoona and divided the proceeds; he denies that he gave Estep thirty-nine acres for assessment, and denies he ever told Edward Bell he owned the north end and Robert the south end; he also states substantially what Wilson says about his conveying his interest in Robert's half to lift his note, but he says it still left Robert owning the undivided half of the north end; that he did try to sell to Edward Bell, but he was acting for both, and wanted to get the debt paid, and Robert allowed him to make any sale he could; he also denies that his share of the timber sold off his and Robert's eighty acres, amounting to $500, lifted the note, and you will remember all that he has said.

"Then they call the two Mrs. McKnights, Mrs. Alloway, Joshua Pate, the two Mr. Alloways, who testify that they saw the two pieces farmed by the two brothers in 1879 and 1880, that they saw them do it together, and one witness, Mrs. Alloway particularly, said it was done jointly and not severally.

"Finally Robert McKnight takes the stand and relates the agreement of partition as already shown, and affirms that he and William never parted their eighty acres. They talked about it, and expected to do it some day, and so managed the land with a view to doing so in the future, but had not yet done it. He says they farmed it together as tenants in common, and divided the proceeds; that they joined in making all improvements and planting the orchard, and as to building a house on the south side, he never intended to do so, and did not begin

to do so, as alleged by defendant's witnesses.  He contradicts defendant and many of his witnesses ; he says he never saw Mr. Estep, and further never gave in thirty-nine acres for taxation ; that he never met Scott Gwin, the surveyor, nor received a draft.  He denies meeting Mr. McCartney and telling him he and William had divided the land.  He denies all the statements made by Edward Bell that he, Robert, had told him in 1875 that he and William had divided the land.  He denies that he ever told Gwin the same thing, and denies ever seeing Gwin on the place.  He denies also that he told Thompson of this partition.  He denies also that he told Mr. Shaw that it was not necessary to have a deed from the heirs to give him the title to the north end.  In short, he denies all the material allegations of defendant's witnesses touching his admission of the land having been divided.

"To this the defendant rejoins by calling Mr. Shaw, who says Robert told him a deed was not necessary, because Robert told him he was the absolute owner of the south end as his share, in connection with one half of the eight acres, in his father's estate.

"Mr. Estep says he never collected any tax off William.

"John McKnight says William told him that it was his share of the timber money from the eight acres that lifted the judgment note, thus showing, as defendant says, that it was not the conveyance of William's interest that enabled him to lift the note.

"Mr. Bell also denies that he agreed to pay Robert for pasturage, or that he admitted to Robert when he bought from McCartney he was buying a lawsuit, or that he ever offered to pay him $300 for his interest.

"Thus it is seen that plaintiff claims there was no partition, that he and William owned and used the land jointly and divided the profits, that though they thought of dividing the land they never did so, and furthermore that he never told any person that they had divided it; that he always claimed his half interest in the north end, and in order to perfect an absolute title to the south end he bought out William's interest therein with a judgment note William owed him ; and that all his acts have been consistent with his continued ownership, and he still owns the undivided half of the north end, and is entitled to recover.

" [On the other hand the defendant says, by himself and a large number of witnesses, that since 1875 Robert and William have not only used and treated the land as divided by the lane, but that both William and Robert have told those who have come here as disinterested witnesses that they had parted the land, and one owned the north end and the other the south end ; that plaintiff's witnesses are mostly interested or relatives ; that all the acts of Robert subsequently, building stable and house, place of living, etc., all point to his separate ownership ; that the consideration for the deed from him to Robert was not the judgment note, but the timber money ; that the land was surveyed by Scott Gwin making the lane the line, and Robert was then present when they fixed a post corner at the lane, and that Robert received from him a draft showing his piece and William's piece ; that after that both Robert and William gave in to assessor Estep each the two pieces corresponding with the survey ; that the subsequent levies by the sheriff, and sheriff's sales, sheriff's deeds and other deeds all described the separate pieces, one being held as the land of William, and the other as the land of Robert ; [6] and finally, that defendant has already had a verdict in a trespass suit tried in this court.

" Now, gentlemen, this is substantially the evidence, and an abstract of the respective claims of the parties on this question of an amicable partition. [When tenants in common of land desire to make partition of it, it is not absolutely necessary it should be evidenced in writing. If they run a line, mark it on the ground, or if there be such a line upon the ground as may be understood and identified as a division line, and they agree upon that line, and they then actually take possession of their respective parts in pursuance thereof, and the partition is fully executed between them, it is sufficient to vest the title in severalty.] [7]

" This is called a parol partition, and is held by the law to be efficacious to set apart a definite interest in severalty to all who are parties to it, and who have a common ownership in the land. Such action severs the common title to the whole, and vests in each in lieu thereof an entirety of title to a fixed and designated portion of the tract. The marked line and the actual possession proclaim to all the actual dominion of the several owners.

" If the weight of the evidence satisfies you there was no amicable or parol partition of those eighty acres between William and Robert; that they did not agree to divide and fix upon the lane as the division line, and in pursuance thereof occupy and possess respectively the pieces on the north and south sides of the lane, then the undivided interest of Robert remains in the north end, and when McCartney, and afterwards Edward Bell bought William's interest in it, then only the undivided one half of William passed by the sale, and Robert's interest would be left in it, and it being still there, Robert would be entitled to recover it, and your verdict should be for the plaintiff for the premises described in the writ.

" [On the other hand, should the weight of the evidence satisfy you that there was a partition agreed on by and between William and Robert; that they made the lane the division line, and in pursuance thereof each actually took possession of the piece respectively selected by them, viz : William the thirty-nine acres north of the lane, and Robert the thirty-nine south of the lane, then you should find there was such partition of the land as vested the title in each in severalty, and in that case when William's interest was sold at sheriff's sale the interest of both William and Robert to the north end passed and afterwards vested in Edward Bell, the defendant, and your verdict should in that case be for the defendant.] [8]

" We have been asked by defendant's counsel to say, if you believe Robert told Mr. Bell in 1875 or 1876 that he owned the south end, and that William owned the north end, in pursuance of a division of the land between them, and so understanding it, he afterwards bought the land in 1885, that Robert would now be estopped from denying the alleged partition, and setting up such a denial in this suit as against Edward Bell, the defendant.

" We refuse to instruct you. In 1875, when Bell was talking to Robert, it was an accidental meeting, and not one sought to derive information in order to make a purchase. There was no privity of relation between Robert and Bell; Robert owed Bell no duty, nor was the situation such that he should either speak or be silent. Nobody was then misled. Bell did not then wish to buy, nor did he then buy. The statement is remembered for ten years, and with many changes since occur-

ring in the history of the land, and without further or later inquiry, in view of the information then obtained, it is invoked as an estoppel ten years later to operate with all the vigor of 1875. It is doubtful if it could have operated then. Does the passage of ten years give it any greater efficacy? To rest for that length of time before the purpose to act is formed, and then to risk the certainty of the title upon the admission, is to invest the doctrine of estoppel with a character which does not attach to it. For these reasons we refuse to instruct you as requested.

" But whilst we say that Robert is not estopped from bringing this suit and setting up this claim, we do say that [the admissions of Robert to McCartney, Bell, Gwin, Estep, Irvin, Thompson and others are evidence for your consideration, tending to show that there was an amicable partition between him and William, and you will therefore determine, in view of this and all the evidence in the case showing the acts and conduct of the parties, whether they did or did not make the alleged amicable partition ; and as you determine this question you determine the case.] " [9]

Verdict and judgment for defendant. Plaintiff appealed.

*Errors assigned* were (1–9) above instructions, quoting them.

*Daniel J. Neff, J. D. Blair* with him, for appellant.—There was not sufficient evidence to support a parol partition: Johnston v. Goodwin, 27 Vermont, 288 ; Ebert v. Wood, 1 Binn. 216 ; Rider v. Maul, 46 Pa. 378 ; Maul v. Rider, 51 Pa. 382 ; Mellon v. Reed, 114 Pa. 653 ; Wolf v. Wolf, 158 Pa. 629.

*A. A. Stevens,* for appellee.—The evidence was sufficient: McKnight v. Bell, 135 Pa. 370.

Per Curiam, May 6, 1895 :

This action of ejectment was brought to recover possession of the undivided half of the northerly half of eighty acres of land, part of a larger tract of which, inter alia, the plaintiff's father, Robert McKnight, Sen., died seized in 1860. A prima facie case for plaintiff was made out by showing that in 1875, in the division of his father's lands, the eighty-acre tract was

allotted and conveyed, by the other heirs, to himself and his brother William McKnight.

In substance, defendant's contention was that at or about the time of said division, the plaintiff Robert McKnight and his brother William made a parol partition, between themselves, of said eighty acres, adopting as their division line a lane which, crossing the tract about midway, divided the same into two very nearly equal parts of about forty acres each; that in pursuance of said partition and possession taken and held thereunder plaintiff became sole owner of the southerly part of said tract, and his brother William sole owner of the northerly part, —the land now in controversy; that the last mentioned piece, thus acquired in severalty by William McKnight, was afterwards sold by the sheriff, as his property, and conveyed to A. L. McCartney under whom defendant claims. In support of this contention considerable testimony, direct as well as circumstantial, was introduced by the defendant; and on the other hand the plaintiff introduced rebutting evidence, tending to show that no parol partition of the eighty-acre lot had ever been made between him and his brother William. The alleged parol partition, on which defendant relied, thus became the controlling question of fact in the case. It is not our purpose to either review or summarize the testimony bearing on the subject, but an examination of the record has satisfied us that the cause could not have been withdrawn from the jury. The question was fairly submitted to them by the learned trial judge in a clear and able charge, which, considered as a whole, is free from any substantial error. We find nothing in the record that would justify us in reversing the judgment.

Judgment affirmed.